## THE CITY OF CLEVELAND v. THE EAST OHIO GAS Co.

*Constitutional law—Public utilities commission—Jurisdiction—
Abandonment of service by utility—Sections 504-2 and 504-3,
General Code—Term of franchise indefinite—Perpetual or
terminable at will.*

1. Sections 504-2 and 504-3, General Code, as amended in 108
   Ohio Laws, pt. 1, 372, known as the Miller law, enlarging
   the powers and duties of the public utilities commission with
   reference to the abandonment of service and facilities by
   railroads and other public utilities, is a valid exercise of
   legislative power.
2. Where a municipal corporation, by franchise, grants to a gas
   company the right to lay gas mains in its streets in order
   to furnish gas to its inhabitants, and such franchise does
   not fix a time when it shall expire, *query*: Is such franchise
   perpetual or continuous, or terminable at will?

(Decided October 5, 1921.)

APPEAL: Court of Appeals for Cuyahoga county.
ON MOTION for judgment on the pleadings.

*Mr. Wm. B. Woods,* director of law; *Mr. Alfred Clum* and *Mr. John D. Marshall,* for plaintiff.
*Messrs. Tolles, Hogsett, Ginn & Morley,* for defendant.

VICKERY, P. J.  This cause came into this court on
appeal from a decision of the common pleas court.
It was first heard a few weeks ago in this court on
an application or motion to fix a temporary rate,
pending further and final litigation of the cause,
which motion was disposed of soon after hearing.
At that time there was another motion pending, a
motion for judgment upon the pleadings.  After the
first motion was disposed of and a temporary rate

fixed, a time was assigned for the hearing of the second motion, that is, the motion for judgment on the pleadings, and the case, so far as it has now been heard, is upon that second motion.

The history of the litigation is so familiar that it is hardly necessary to repeat much of what is already known. Suffice it to say that The East Ohio Gas Company had had the natural gas franchises for about twenty years, and that it became assignee of the franchises that had been granted to The Cleveland Gas, Light & Coke Co. and The Peoples Gas, Light & Coke Co., and I believe there was a consolidation of these companies. The East Ohio Gas Company succeeded to all the rights held by the other companies.

The franchise under which The East Ohio Gas Company occupies the streets was passed in 1901 or 1902, and was accepted by the company. In that franchise the law requires a rate fixing period, which shall not exceed a period of ten years. In 1911 a rate-fixing ordinance was passed, which provided for 30-ct. gas for the first eight years, and 35-ct. gas for the two remaining years. This rate-fixing period expired on the 8th day of February, 1921. Prior to that time the city council passed a new rate-fixing ordinance, in which they fixed the price of natural gas to be furnished for the period of ten years next ensuing at 35 cents, the same as it had been the last two years of the former rate-fixing ordinance. The Gas Company notified the city of Cleveland that it would not accept the terms of this last rate-fixing ordinance, and notified the city that it elected to terminate its franchise with the city of Cleveland and desired to withdraw from this field in serving the public with natural gas; and that it proposed

to do so at the expiration of its franchise, on the 6th day of February, last. Whereupon the city brought an injunction, and set up the various claims of the city in the petition, and a temporary restraining order was granted, from which time, up until the 1st day of October, this year, The East Ohio Gas Company has been furnishing gas at the rate of 35 cents per thousand cubic feet. There were various motions and demurrers filed to the petition to simplify the issue, and finally the Gas Company filed an answer. Motions were directed to this answer in various forms, and finally the city filed a reply; and the petition, answer and reply constitute the pleadings that ultimately raised the issue that is on trial before this court.

The case was heard in the court below before Judge Duncan, of the common pleas bench of Hancock county, sitting by designation in this county. After a hearing he granted the prayer of the defendant company, overruled the contention of the city, and authorized the Gas Company to discontinue service, and set a time, to-wit, November 1st, when that should be done, and ordered the Gas Company to have its pipes and paraphernalia pulled out of the ground by the 1st day of April, 1922, and fixed a temporary rate pending the destruction of the Gas Company's property. That decision was appealed from and carried into this court, and, as I have already said, the case was heard here upon the motion to fix a temporary rate, which motion has already been disposed of, and is now heard upon the motion before the court.

It is claimed that the motion raises issues which would show whether the city had or had not a right to maintain this suit; that the motion brings two

questions before the court for review and that if the court decides either one in favor of the city the motion must be denied, but, in the event that the court should decide against the city on both propositions, then it would be the end of the litigation so far as this court is concerned.

The two questions involved are:

First, was the franchise that was granted to The East Ohio Gas Company in 1901 a continuous franchise, or was it a franchise, terminable at will, at the expiration of any of the rate-fixing periods? A reading of the franchise will show that there is no time fixed when it shall expire, and it is therefore claimed, on the part of the city, that this franchise was a perpetual franchise, and gave the city and the gas company the right to enter into an agreement to fix the rate at various intervals, and that when that rate was fixed, and the Gas Company accepted the same, it was a contract at that rate during the period for which the rate was fixed. On the other hand, the Gas Company claims that it was a franchise terminable at the will of either party, at the expiration of any of these periods, where the rate had been fixed by agreement between the city and the Gas Company. This is the first question to which our attention has been directed.

It must be conceded that in view of the decisions of our courts in Ohio there is a grave question involved as to whether this franchise is a perpetual franchise, or not. The court below held, and it is argued here with much force, that the case of *East Ohio Gas Co.* v. *City of Akron,* 81 Ohio St., 33, is conclusive of the proposition that this franchise is not a perpetual franchise, but is simply indeterminate, existing only so long as the parties mutually

agree thereto. That the supreme court did hold this, in a case similar to the one at bar, the *Akron case* referred to, is undoubtedly true, and if that case stood alone there would not be much question before the court as to what the nature of this franchise in the instant case is. It is claimed by the city that the decision of the supreme court, in *Gas Co.* v. *City of Akron, supra,* has been overruled by a later decision of the United States supreme court; that is that the legal effect of it has been destroyed by the decision of the United States supreme court in the case of *Northern Ohio Traction & Light Co.* v. *State of Ohio, ex rel. Pontius, Pros. Atty.,* 245 U. S., 574, which expressly overruled *State, ex rel. Pontius, Pros. Atty.,* v. *Northern Ohio Traction & Light Co.,* 93 Ohio St., 466. By a recurrence to the 93d Ohio State, at page 467, we find this entry:

"Judgment for relator on authority of *The East Ohio Gas Co.* v. *The City of Akron,* 81 Ohio St., 33. *Judgment for relator."*

Now it will be noticed that the supreme court of Ohio in the *Northern Ohio Traction & Light Co. case* based its ruling upon the decision in the *City of Akron case,* and held the same way, namely that the franchise granted by the county commissioners to The Northern Ohio Traction & Light Company was not a perpetual franchise, but one terminable at will; for that was the principle involved in the *Akron case.*

Our attention has been called to the dissenting opinion of Judge Jones in this case, because it has been argued that the statutes giving authority to county commissioners to grant railroad franchises are somewhat different from those in which municipalities are given authority to grant franchises to gas companies. It is true the dissenting opinion of

Judge Jones calls attention to these different statutes, but that, in my opinion, simply accentuates and makes plainer the evident purpose of the majority of the court in their opinion in the *Northern Ohio Traction & Light Company case,* because it could not have been said that they slurred over these different classes of statutes, because it must have been brought to their attention by Judge Jones and the two judges who dissented with him, Judges Newman and Donahue; and they ignored this distinction and placed themselves squarely upon the rule of law laid down in the *Akron case.* It will be well to bear this in mind, for when the *Traction & Light Company case* was taken to the supreme court of the United States, that court, in the 245th U. S. report, at page 574, reversed the supreme court of Ohio in the *Traction & Light case,* and, by a parity of reasoning, *overruled* the *Akron case,* and in substance held that a franchise in which no time is specified is in effect a continuing or perpetual franchise; and they criticized, and, in effect, overruled, as has already been said, the case of *East Ohio Gas Co.* v. *Akron, supra.* Justice McReynolds, in the course of his opinion, at page 584, says:

"Beyond serious doubt, under constitution and statutes of Ohio in 1892 county commissioners had power to grant franchises over public roads valid for twenty-five years, if not perpetually. Nothing said by the state courts prior to *East Ohio Gas Co.* v. *Akron* (1909), is cited which intimates that grants, without specified limit of time, were revocable at will. Evidently this was not the settled view in 1903 when the Circuit Court distinctly adjudged that accepted ordinances by a city between 1861 and 1873, authorizing construction and operation of street

railways, silent as to time, created perpetual rights, subject however to revocation by the General Assembly. *State, ex rel. Taylor,* v. *Columbus Ry. Co.* (1903), 1 Ohio C. C. (N. S.), 145. This judgment was affirmed in 1905, 73 Ohio St., 363, 'on the sole ground that the defendant had present right to occupy the streets at the time of the commencement of this action'—a result hardly intelligible upon the theory that the grants were revocable at will. Apparently the doctrine announced in *East Ohio Gas Co.* v. *Akron,* was not suggested in either court.

"The circumstances surrounding the grant of 1892 show no intention either to give or accept a mere revocable right. It would be against common experience to conclude that rational men wittingly invested large sums of money in building a railroad subject to destruction at any moment by mere resolution of county commissioners. *Detroit* v. *Detroit Citizens' Street Ry. Co.,* 184 U. S., 368, 384."

Taking the last sentence to heart, let us see. The East Ohio Gas Company, by its franchise of 1901, and subsequent transactions between that company and the Peoples Gas, Light & Coke Company and The Cleveland Gas, Light & Coke Company, acquired all the rights to distribute both artificial and natural gas in the city of Cleveland, and it succeeded to all the rights and powers that its predecessors had. Can it be conceived that the city council of Cleveland ever thought it possible that the old Cleveland Gas, Light & Coke Co., or the old Peoples Gas, Light & Coke Co., could, at any point of time, when a rate-fixing period had expired, terminate its franchise, and leave the city of Cleveland in utter darkness? Is it conceivable that such could have been in the minds of the council of Cleveland, when these fran-

chises were granted? Was it not intended that, so long as the utility company could furnish the product which it was selling to the public, it would want to furnish it, and would furnish it? Is it to be conceived that in 1901, when the franchise was granted to The East Ohio Gas Company to lay its pipes and mains in the city of Cleveland, it was the understanding that at the expiration of any period either would have the right to tear up the pipes; that the city could compel the Gas Company, because it could get a better franchise from some other company, to pull up its mains and transport its property to some other field? Was it not intended that that franchise should last so long as natural gas could be furnished to the city of Cleveland? Whether this be a perpetual franchise, or a continuing franchise, it would seem that this must have been the view of both The East Ohio Gas Company and the city council of Cleveland when this franchise was granted, because neither party would be so foolish as to want to have a change of producers and distributors of gas and the turmoil incident to tearing up the streets, vacating and making way for a new company to furnish the same product. It seems to me that the thought of the last few years has been changing with respect to several things of great public moment. One is, it was once thought that competition among public utilities was a good thing, that it was a desirable thing to have competition in the telephone field, and it was thought a proper thing to have competition in the furnishing of light and power. But the trend of thought of the present day is toward recognition of the fact that there are natural monopolies, and that in that field competition is not the best way to settle the matter with regard to the public interests. With

this in mind the state of Ohio has created by law a utilities commission, which has the right to fix rates, and to control what public utilities may charge. With this later-day legislation, this regulation, the evil that was thought to result from granting perpetual franchises to public utilities has been done away with, and there is no reason at all now why a public utility should not be given a perpetual franchise, with rate-fixing periods, and if the rate is not proper or right, the utilities commission can make it right. There can be no doubt but that The East Ohio Gas Company, if it can get proper remuneration for its product here, would rather furnish gas to the people of Cleveland, inasmuch as it has its plant established, and its pipes and mains laid, than sacrifice the entire capital invested in its property here and go to some other place, get a new franchise, and establish a new plant in a new community; and, surely, with the courts and the utilities commission —the courts with power to intervene and prevent a confiscatory rate, and the utilities commission with power to fix a proper rate—it is not necessary to destroy the vast plant of The East Ohio Gas Company in order to get proper remuneration. There can be no reason why the franchise should be terminable at the will of either party, to the great detriment and suffering of the vast multitude of people dependent upon the utility's product. So, there have been some decisions along that line. In the case of *City of Jamestown* v. *Pennsylvania Gas Co.*, decided by the district court for the western district of New York, February 5, 1920, reported in 263 Fed. Rep., 437, the court says, at page 439 :

"Such vested rights are binding on both parties, and cannot be reduced to a mere revocable license or

permission, since they were secured without any depending conditions or reservation. An individual, it is true, could decline to avail himself of the use of gas, or stop using it; but the municipality could not arbitrarily deprive the company of its right to use the streets and highways for performing the service of distributing natural and manufactured gas to its customers. This is so, even though no duration of time or limitation of use was fixed in the grant or privilege, since an omission to do so does not imply a right of stoppage by the gas company while gas is available to it for fulfilling obligations.''

The same doctrine is announced in the case of *City of Louisville* v. *Cumberland Telephone & Telegraph Co.*, 224 U. S., 649.

Referring again to the *Jamestown case* the court, at page 441, has this to say with respect to *East Ohio Gas Co.* v. *City of Akron, supra*:

''The Supreme Court (of the United States) disagreed with that decision, and held that where there are no controlling provisions in the state Constitution or statutes, and no prior decisions by its courts to the contrary, a franchise granted by the state authorities, without limit as to duration and without apparent intention to accept a mere revocable right, is such a contract as cannot be annulled at the will of the granting authority.''

In the syllabus of *State, ex rel. Taylor*, v. *Columbus Ry. Co.*, 1 C. C., N. S., 145, opinion by Judge Summers, it is said:

''1. The right to construct and operate a street railway in streets of a city, prior to the act of May 14, 1878 (75 O. L., 359), was a franchise or privilege granted by the state upon condition that the city consent to its exercise.

"2. Such consent given prior to said act without limitation of time or to a corporation with succession during the term of its charter is revocable only by legislative authority.

"3. A franchise or privilege to construct and operate a street railway granted and consented to prior to said act without limitation of time is perpetual, but subject to be determined by the General Assembly under Section 2 of Article I, or under Sections 1 and 3 of Article XIII of the Constitution."

It will be seen, therefore, that there was some reason why the supreme court of Ohio was very *cautious* in the use of words in the *Akron case,* because there is grave doubt, taken in the light of the present-day belief, concerning necessity for and advantages to be derived from having one utility ready at all times to serve the public, and where a franchise has been granted without limit as to time, there is some question as to whether it would not be regarded as a perpetual franchise. So in reading the decision in the *Northern Ohio Traction & Light Company case,* decided by the supreme court of the United States, reported in 245 U. S., 574, one cannot help wondering whether the supreme court of Ohio would not have been overruled in the *Akron case* if that case had been taken to the supreme court of the United States. It seems to us that if the question there involved had been fairly before the United States supreme court, that court surely must have reversed the Ohio supreme court. Accordingly it will not do to say that there is not a question, or the possibility of a question, as to whether or not this franchise is revocable at will, or whether or not it is a perpetual franchise subject to rate-fixing at definite periods of time. But we do not deem it

absolutely necessary in the disposition of this motion to hold that this franchise of The East Ohio Gas Company is a perpetual franchise, because, if the Gas Company cannot discontinue its service and withdraw from this field without the consent of the utilities commission, which it is admitted it has not obtained, then the motion must likewise be overruled; and that brings us to a consideration of the second proposition argued before us, and that is the validity of the so-called Miller law.

His Honor, Judge Duncan, in the court below, held that the Miller law was unconstitutional, and it has been argued before us with much force that the Miller law, as amended, which was passed by the legislature April 15, 1919, and is to be found in 108 Ohio Laws, pt. 1, 372 (Sections 504-2 and 504-3, General Code), is unconstitutional. Before the amendment of April 15, 1919, a similar provision in our law applied to street railroads and railroads, that no street railroad or railroad could terminate its right to serve the public and withdraw the service from the public without the consent of the utilities commission. Somewhere before 1917 The East Ohio Gas Company sought to withdraw service from the city of Alliance. In the case of the *City of Alliance* v. *East Ohio Gas Co.*, unreported, decided by the court of appeals, it was held that the company might terminate its relations with the city of Alliance and withdraw therefrom, the court of appeals following the *Akron case* in that respect, and the supreme court refused motion for order to the court of appeals to certify its record. Now, that case, if it were important, could be readily distinguished from the *Akron case;* but the point I want to make is that Mr. Miller, who represented the Alliance district in

the Ohio legislature, sought to prevent this sort of a thing and accordingly amended the law, heretofore referred to, which was originally known as the Gilmore law, by inserting that no public utility, gas company, telephone company, or the like, could withdraw its service without the consent of the utilities commission. Now it is urged that this law is invalid for the reasons, first, that it impairs the obligation of a contract, and, second, that it is retroactive; that the franchise of The East Ohio Gas Company was granted long prior to the passage of the Miller act and it is therefore an invalid exercise of power when the legislature seeks to make such a law retroactive and apply it to corporations that had their charters prior to that time. Apparently, in this argument, sight is lost of the provision of our Constitution of 1851 and the provision of our Constitution of 1912. Judge Jones, in his dissenting opinion, in the *Northern Ohio Traction & Light Company case,* calls attention to the *Dartmouth College case,* decided in 1819, in which Mr. Justice Story suggested, in his opinion, that the legislation of the various states conferring corporate rights and privileges, in order to avoid the inhibition of the contract-impairing clause of the constitution, might contain a provision reserving to the legislature the right to amend or repeal the right so conferred. Now, in accordance with this suggestion, the various states, including Ohio, prior to 1851, in legislation granting powers and privileges in perpetuity expressly reserved the right to amend or repeal such statutes. Our attention has been called to the fact that the Constitution of 1851, which was in force when the East Ohio Gas Company got its franchise from the city of Cleveland, provided only for the

amending and repealing of the charter of a corporation. The amendment to the Ohio Constitution, adopted in 1912, went much farther than this. The provision of Section 2, Article XIII, in the present constitution, is as follows:

"Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed. Corporations may be classified and there may be conferred upon proper boards, commissions, or officers, such supervisory and regulatory powers over their organization, business and issue and sale of stocks and securities, and over the business and sale of the stocks and securities of foreign corporations and joint stock companies in this state, as may be prescribed by law. Laws may be passed regulating the sale and conveyance of other personal property, whether owned by a corporation, joint stock company or individual."

It is admitted that if this latter provision had been contained in the Constitution of 1851, or when The East Ohio Gas Company got its charter, it would be subject to that amendment. But it is claimed that it is much broader than the provision in the Constitution of 1851. We think that the provision of 1851 was really adopted, as Justice Story suggested in the *Dartmouth College case,* for the purpose of having laws passed to take care of corporations that had received their charter from the state, so that any law that the legislature might pass would not be inhibited by the Constitution of the United States, in that clause which prohibits any state from passing any law impairing the obligation of contracts; and all that the Constitution of 1912 did was to put in print what was plainly and necessarily implied from the provision of the Constitution of 1851. So, then,

when The East Ohio Gas Company got its franchise, it was subject to the legislative control over the charters of corporations, not only the power to repeal or amend, but to regulate as well, and so the Miller law was only the exercise of a power which was plainly implied in the Constitution of 1851. But, suppose that this is a mistaken view of the provisions of the Miller law, we still think the law would be plainly maintainable as an exercise of the police power of the state. Under the police power, and in the exercise of the police power, the legislative authority has power to pass almost any law, without regard to how it may affect existing contracts, and how it may impair obligations of contracts; if the subject-matter be in the nature of police regulation, then that power cannot be taken away from the legislative authority.

An examination of the so-called *Slaughter House cases* and the *Chinese Laundry cases,* and a great many other cases of similar import, will amaze one as to the extent to which the state legislature may go in passing laws affecting the health, comfort and convenience of the public, even though such laws may interfere with existing contracts and impair the obligation of contracts, and even though they may be retroactive in their nature. Applying that doctrine to the case at bar, with respect to the Miller law, let us see. Here it is claimed that a utilities corporation that is serving natural gas, say to 300,-000 families in and about Cleveland, can, upon notice —and nobody has said how long that notice must be —cut off the service at will. The suffering, the inconvenience and destruction of property that would result if this were permitted to be done, would be so marked and so grave that it would be next to

a calamity to the city of Cleveland; nay, it would be a calamity. Suppose it were the dead of winter; the health of thousands of people would be jeopardized, the lives of the weak, the infirm, and children, would be sacrificed. Does not the law, then, come squarely within the police power, which nobody can fritter away?

Again, when The East Ohio Gas Company laid its mains, and made the connections to the thousands of homes in the city of Cleveland, the home owner was put to great expense, in some instances as high as hundreds or maybe thousands of dollars, in establishing natural gas furnaces and connections in the various homes. All of this property would be destroyed, just because the Gas Company served notice upon the city that it was going to withdraw. Should there not be a supervisory power over the manner in which it may withdraw? Should it not submit that right to withdraw to the public utilities commission, which would have the power to say under what circumstances and how it should discontinue service and withdraw from the community it had served so long? The health, comfort and convenience of the people would be served in a marked degree, if this were done; and the injury would be manifest and manifold if this were not done.

It is argued, however, that this confers judicial power upon the utilities commission. I do not think that follows, at all. The right could be determined, and must be determined, by the courts, but after that right has been determined I do not see how there could be any objection to having the manner in which the service is discontinued overseen by the utilities commission. It would lessen suffering, and tend to

lessen the evil of the withdrawal of a public utility from a community that it had served.

We think for these reasons, and many others that might be urged, that the Miller law is a valid exercise of legislative power. It is argued that the preamble of the law does not place it within the police power; that that was not the purpose of it; that it was simply an amendatory act to the Gilmore law, which related only to railroads and street railroads. We do not understand that to bring an act within the police power of the state the police power must be mentioned. If it legislate, and the purpose be to legislate, upon a subject that is within the police power, even though it is not mentioned, it would still be an exercise of the police power, and the law would be valid notwithstanding the preamble did not mention the police power, and notwithstanding the preamble and the act itself did not mention the purpose for which it was passed. We think, however, if the legislation and litigation with respect to this law be kept in mind, it will not be hard to discover that the Miller law was passed for meeting a situation exactly such as was brought about by the *Newcomerstown case,* 100 Ohio St., 494, the *Alliance case,* and the *Akron case* itself.

We are, therefore, of the opinion that the Miller law is a valid exercise of legislative authority, and is therefore valid. That being so, The East Ohio Gas Company would have no right to withdraw its service from this community without the consent of the public utilities commission, and the consent not having been obtained it necessarily follows that this motion must, therefore, be overruled; and this is true whether the franchise be a perpetual franchise

or one terminable at will. In either event, the Miller law, if valid, as we conceive it to be, demands that the consent of the utilities commission be obtained before service can be determined.

*Motion overruled.*

INGERSOLL and SULLIVAN, JJ., concur.