**Bobby L. CHAMPION, Petitioner,**

v.

**S&M TRAYLOR BROTHERS and Lumbermen's Mutual Casualty Company, Respondents.**

**No. 81–1713.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 1982.

Decided Oct. 8, 1982.

---

Charles L. Janes, Columbus, Ohio, for petitioner.

Robert B. Adams, Washington, D. C., was on the brief for petitioner, also entered an appearance for petitioner.

Arthur V. King, Rockville, Md., for respondents.

Before WALD and MIKVA, Circuit Judges, and OBERDORFER,* United States District Court Judge for the District of Columbia.

Opinion for the Court filed by District Judge OBERDORFER.

OBERDORFER, District Judge:

The petitioner, Bobby L. Champion, seeks review [1] of a Decision and Order of the Benefits Review Board (Board) which affirmed an order of an Administrative Law Judge (ALJ) that Champion was entitled to compensation of only $166.96 per week for five weeks, or a total of $834.40.[2] The ALJ found that Champion suffered a temporary total disability when his dormant childhood asthmatic condition was aggravated by dust and fumes to which he was exposed in the course of his employment as a construction laborer in the tunnel for the Washington, D. C. subway system. However, the ALJ also concluded that Champion was not entitled to any compensation on account of his continuing total disability from persisting asthma and morbid obesity, because "it has not been established that there was any causal relationship between Claimant's employment and such disability . . . ." App. 6.

We reverse, because the Board erroneously approved the ALJ's action despite respondent's failure to adduce substantial evidence severing the causes and consequences of Champion's temporary total disability from his permanent disability.

Specifically, the ALJ, with Board approval, failed properly to apply:

(1) Congress's requirement that "it shall be presumed, in the absence of substantial evidence to the contrary . . . [t]hat the claim comes within the provisions of the Act." [3]

(2) Court decisions that "the employers' 'substantial evidence' must be 'specific and comprehensive enough to sever the *potential* connection' between the disability and the work environment," [4] and that doubtful questions, including factual ones like work-relatedness, must be resolved in favor of claimants.[5]

(3) The command of the Supreme Court that the Act "must be liberally construed in conformance with its purpose and in a way which avoids harsh and incongruous results." [6]

The Supreme Court, as well as the circuit courts and the Board, has long emphasized the "humanitarian nature" of the Act "as a justification for its liberal construction." *E.g., O'Keeffe v. Smith, Hinchman & Grylls Assoc.,* 380 U.S. 359, 362, 85 S.Ct. 1012,

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).)

1. Judicial review is authorized by Section 21(c) of the Longshoremen's and Harbor Workers' Compensation Act, as amended, 33 U.S.C. § 921(c) (Act), which was made applicable to claims of injury of an employee carrying on an employment in the District of Columbia by Section 1 of the District of Columbia Workers' Compensation Act, 36 D.C.Code § 501 (1973 ed.).

2. Plus interest at 6 percent and an attorney's fee of $3,120.71.

3. Section 20(a); 33 U.S.C. § 920(a).

4. *Hensley v. Washington Metropolitan Area Transit Authority,* 655 F.2d 264, 268 (D.C.Cir. 1981), *cert. denied,* 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982), quoting with approval *Parsons Corp. of California v. Director,* 619 F.2d 38, 41 (9th Cir. 1980) (emphasis in original).

5. *Stevenson v. Linens of the Week,* 688 F.2d 93 at 98 (D.C.Cir.1982); *Wheatley v. Adler,* 407 F.2d 307, 313 (D.C.Cir.1968) (*en banc*); *J. V. Vozzolo, Inc. v. Britton,* 377 F.2d 144 (D.C.Cir. 1967); *Friend v. Britton,* 220 F.2d 820, 821 (D.C.Cir.), *cert. denied,* 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 745 (1955). *See also Steele v. Adler,* 269 F.Supp. 376 (D.D.C.1967).

We do not read *U.S. Industries/Federal Sheet Metal, Inc. v. Director,* 455 U.S. 608, 102 S.Ct. 1312, 71 L.Ed.2d 495 (1982), to derogate these principles. For example, the majority specifically distinguished our *en banc* decision in *Wheatley v. Adler, supra, id.* 102 S.Ct. at 1316, and the dissenters embraced *Wheatley* and related cases without challenge. *Id.* 102 S.Ct. at 1319.

6. *Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 91, 98 L.Ed. 5 (1953) (Warren, C. J. for a unanimous Court); *Baltimore & Philadelphia Steamboat Co. v. Norton,* 284 U.S. 408, 414, 52 S.Ct. 187, 189, 76 L.Ed. 366 (1932) (Butler, J. for a unanimous Court).

1014, 13 L.Ed.2d 895 (1965); *Friend v. Britton,* 220 F.2d at 821. We are also reminded by this case that Congress made a pragmatic trade-off for this humanitarianism. The Act strictly limits employers' liability for industrial accidents and makes their exposure from such accidents more predictable and their insurance coverage less costly. Thus, Section 5(a) of the Act makes an employer's liability under it "exclusive and in place of all other liability of . . . employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death." 33 U.S.C. § 905(a). Lawyers experienced in prosecuting, defending, or judging well-prepared jury trials growing out of serious medical problems will appreciate the dramatic effect of this trade-off. For example, the exposure of this employer and its insurance carriers in a trial at law of Champion's claim (available if the Act had not barred it) could be different by cosmic proportions from their limited liability under the Act. This legislative trade-off is a further basis for the courts' practice of construing this humanitarian law so as to resolve doubts in favor of the employee and their insistence that the Board and ALJ's do the same.

We turn then to a relatively extensive exposition of the administrative record that displays the several material "doubts" that the ALJ resolved in a manner that is inconsistent with the Act as authoritatively construed.

## II.

### A.

In June 1974, when Champion went to work for respondent as a construction worker, he was 23 years old, was 5 feet 11 inches tall, and weighed 190 pounds. As a child, Champion had asthma attacks, but the asthma had been dormant since he was 17.[7] He finished the 11th grade at Eastern High School, where he played tennis, basketball, volleyball, and soccer and had won a trophy in the 440-yard track competition. After high school, he played semi-professional football. At the same time, he earned his living primarily as a construction laborer. He had also worked as a truck driver, a cement finisher, and after vocational training at Armstrong School, a filing clerk. Although Champion was not married, he had three children whom he supported in his home. He had a mother who lived elsewhere.

In June 1974, Champion's first work for respondent was with a crew of miners who were digging a tunnel about 60 feet below the surface for what is now the WMATA subway. Initially, he worked an average of 50 hours per week, a minimum of 40, and a maximum of 80. His crew served a grouting machine, which mixed cement with water and sprayed it behind miner plates securing the walls of the tunnel as it was being dug. The crew's task included breaking cement bags, a process that threw off substantial cement dust. App. 67–68. The grout machine and the 35- and 50-ton locomotives also gave off fumes in the underground work area. App. 81.

Thereafter, Champion worked on a train in the tunnel. His tasks included taking up railroad ties, carrying them to a car, and throwing them on. In addition, he was part of a three man crew that ran a dirt blower, a task that sometimes required shooting water into a corner, causing the dirt to blow back into the faces of the crew. App. 83–84. Masks were prescribed for the blower crew, but, according to Champion, they were not available "the majority of the time." App. 83. After two or three weeks in the blower crew, Champion began work about a quarter of a mile from the entrance as a laborer on the clean up crew, cleaning up all the trash and garbage in the tunnel. His job consisted of "spading, mucking, and hauling heavy objects." App. 65.

---

7. Although he had been treated for asthma as an outpatient on three occasions after he was 17 (most recently in 1973), it had not prevented his athletic activities, nor had it disabled him from working so as to support himself and his children in his own home.

When Champion began work as a miner, he was able to "jog and run all the way up the steps." App. 82. After about 3 months, he "had to walk up those steps. All that stuff was getting in my throat." *Id.*

On his job, Champion worked under Foreman Robert Stewart on two assignments. On the first assignment, Champion did not appear to Stewart to have any breathing problems and was a "good worker," "outstanding;" Stewart had no "squawks" about Champion. App. 69. The second time, however, he coughed, was out of breath, "over-exhausted," and spit up blood when carrying heavy objects. App. 69–70, 73. According to Champion, as his employment progressed, "I had short wind and I felt my chest was getting real tight, and I started spitting up blood and my throat got like somebody was choking me." App. 86.

On February 25, 1978, he became so sick that he asked the safety man to take him to the G.W. University Hospital. App. 87. The safety man said "he couldn't because [Champion] was getting to be a hazard on the job." *Id.* So Champion caught a taxi and took himself to the emergency room at G.W. He testified that the G.W. emergency room staff "kept me for a long time until they could relieve me because I was really short winded." *Id.* The G.W. staff sent Champion to D.C. General Hospital because he had only "job insurance." *Id.* He was admitted the same day and remained intermittently for about three months. The D.C. General staff examined him, tested him, did a biopsy, and made diagnoses of asthma and sarcoidosis. Medication included prednisone.[8]

According to Champion, this and other medication helped his breathing difficulty "somewhat," but he "never really got relief.

I'd get relief down to a certain place. I'm not fully relieved." App. 90. Although until then he had always controlled his weight, within a year after he was hospitalized he gained 50 pounds. At the time of the hearing in 1979, he weighed about 320 pounds. App. 90. He was also "allergic to a lot more things," and his sex life had changed. He had to sleep "sideways" because if he slept deeply, flat on his back, the fluid in his chest might "drown" him. He coughed "all the time," so much so that he sometimes could not talk for a couple of days a week, "sometimes longer." App. 91.

Although D.C. General prescribed a 900 calorie diet to control Champion's weight, he "sometimes" ate as much as 18 ounces of steak, or would have 2 or 3 sandwiches a night, because ". . . if somebody made me mad, I get emotional and I eat a lot. That's when I forget about the diet." App. 50.

Champion testified that:

It's like if someone in the courtroom makes me mad, I get exhausted; and it seems like my chest gets tight and I get real balled up in a knot, and the next thing you know my blood gets high, and I get very short of wind. . . . I get to coughing so bad I have to hold my head because I get dizzy.

App. 106–7.

As of the time Champion came out of the hospital in August 1975, he had lost his three children because he could not support them.[9] He was on welfare [10] and living with his mother, who was taking care of him. App. 102. Champion testified that he "was used to making a normal living, making a decent salary. . . . Now with welfare, it's enough to make anybody get gray. I wasn't used to living that way, and it bothered me emotionally. It changed my

**8.** Prednisone is a synthetic derivative of cortisone used primarily for its anti-inflammatory effects and its modification of immune responses. *Physician's Desk Reference* 1521 (35th ed. 1982). Tendral, Lasix, and Valium were also prescribed.

**9.** Q. When did you lose them?
A. I went in the hospital, and when I came out they was gone.

App. 102.

**10.** Between 1975 and 1979, Champion attempted work as a security guard for Metropolitan Detective Agency, but was fired because "by me being sick, I wasn't reliable." App. 92. He tried for other work with other agencies. "I tried 3 times; same old thing. I tried hard, but I couldn't make it." *Id.*

sex life also. That tore me up." App. 101–102.

## B.

Champion presented no live medical testimony. Instead he filed a January 18, 1978, medical report written to his counsel by Dr. Frank J. Borsody. Dr. Borsody related Champion's history of bronchial asthma and his exposure to dust and grout while working as a laborer in 1974. After about two months he developed "easy fatiguability," which progressed after another month to more "lassitude," coughing, a bloody sputum and cold sweats, the combination of which forced him to leave his job. App. 39. According to Dr. Borsody's history, D.C. General Hospital established a diagnosis of sarcoidosis, for which Champion was treated with steroids. He gained weight steadily thereafter. In addition, the asthmatic condition persisted. Dr. Borsody's examination noted, among other things, mild respiratory distress and a weight of 313 pounds against a normal weight of 189–200 pounds. *Id.*

Dr. Borsody noted that the cause of sarcoidosis is undefined, and medication for it is "quite variable and individual." App. 40. According to Dr. Borsody, the disease is an "enigma," and

> It is problematical to question as to the causal relationship of his adverse working condition and sarcoidosis. . . . [Y]ou could say the highly contaminated area with particulate matter abounding could have ignited the condition. Contrarywise . . . dust grout and noxious vapors have not been established as causal factors in sarcoidosis.

App. 40.

As to the asthma, Dr. Borsody stated "unequivocally" that Champion's "adverse

working condition would be expected to aggravate his previously existing bronchial asthma." App. 39. Dr. Borsody wondered about the "wisdom of employing this man for such a position." [11] He concluded that at present "his active asthma" and his obesity [12] "would seem to preclude gainful employment." App. 40.

Dr. Borsody made no mention of any history or observation of emotional problems or medication for them.

Champion also offered written reports by Dr. David B. Simon, an expert in pulmonary diseases, and Dr. Sol Katz of Georgetown University Hospital, also a pulmonary disease expert with special experience in the study and treatment of sarcoidosis. Both of these doctors had examined Champion during April 1978 at the employer's request and were called by the employer as witnesses.

Dr. Simon's report, as extended by his testimony, described essentially the same history as that related by Dr. Borsody. [13] According to Dr. Simon's history, [14] D.C. General Hospital put Champion on prednisone for 6 months and on withdrawal doses for an additional 3 months. App. 111. During that period, his weight increased from 190 to 240 pounds. At the time of Dr. Simon's examination in April 1978, he found, among other things, a weight of 315 pounds and "severe obstructive impairment" of Champion's pulmonary function. Dr. Simon's impressions were "chronic asthma with severe obstructive impairment," "multiple allergies," and "morbid obesity." App. 113. Although he found no evidence of sarcoidosis at the time of the examination (App. 114, 121), and that Champion was

---

11. Dr. Borsody also wondered about "the wisdom . . . in a larger context about the safety precaution of the project which did not furnish masks to their employees." App. 39.

12. Dr. Borsody wrote of "iatrogenically induced mass." App. 40. *Dorland's Illustrated Medical Dictionary* (25th ed. 1974) defines "iatrogenic" as referring to "any adverse condition in a patient occurring as a result of treatment by a physician."

13. According to Dr. Simon, Champion's childhood asthma "became quiescent at age 17, not to recur again until 1974." App. 111.

14. Dr. Simon testified on cross-examination that he had not seen the D.C. General Hospital records. App. 120.

not then taking prednisone, Dr. Simon stated that Champion's "asthma was severe enough that I would probably have had him on Prednisone at that time [April 1978] for control of asthma." [15]   App. 131.

Dr. Simon was of the opinion that "the tunnel exposure aggravated the asthma during that period, but it could not be considered as being the *sole* cause of his asthma, [nor could it] account for the prolonged duration of the asthma lasting several years after leaving the environment." [16]   App. 113 (emphasis added).   According to Dr. Simon, Champion's current asthma is "unrelated to any exposure in the tunnel . . . to the dust, the diesel fumes of the tunnel, back in June 1974." [17]   App. 119.

Dr. Simon testified that "recognized things" that could cause this asthma include irritation, noxious fumes, strong perfume, exhaust, and "emotional factors."   App. 117.   He acknowledged that he did not know specifically what was continuing Champion's asthma.   App. 126.   However, while Dr. Simon noted that Champion "sleeps poorly," (App. 42) the doctor apparently did not inquire about Champion's emotional symptoms and, in any event, did not mention them in his report or in his testimony.   Nor did he ever state any other cause for the persistence of the asthma after it was aggravated by the tunnel exposure.

Dr. Katz reached essentially the same ultimate conclusions as the other two doctors:

Mr. Champion is currently disabled because of respiratory difficulties due to bronchial asthma.   In addition, obesity is so severe that this by itself would keep him from functioning at a job in a normal fashion.

App. 47.   Speaking generally, Dr. Katz reported with respect to asthma generally that:

Most asthmatics will have an exacerbation when exposed to dusty atmosphere . . . irritant fumes or . . . high air pollution.   However, this episodic asthma occurs during the exposure to the irritant and does not continue for years thereafter.   In other words, the aggravating component does not persistently cause bronchospasm once the aggravating factor has been overcome.

App. 47.

Dr. Katz's testimony confirmed that the cause of sarcoidosis is not known:

It is a disease of unknown etiology, first described in 1869 by Jonathan Hutchison, who didn't know the etiology, and then 100 years later, we still don't know the etiology.   Many theories have been suggested, but no agent has been identified as the cause of sarcoidosis.

App. 136a.   Dr. Katz testified that medical science had investigated dust without establishing it as a cause of sarcoidosis, and that the more likely key was genetic.   The disease had a larger (10–1) incidence among blacks than others.   App. 137.

**15.**  Dr. Simon found Champion "quite ill" and "totally disabled."   App. 120.   Dr. Simon recognized that prednisone is "quite an appetite enhancer, as well as altering fat metabolism . . . [and] with significant side effects."   App. 131.   Dr. Simon, like Dr. Borsody and Dr. Katz, recognized that the etiology of sarcoidosis is unknown, and that in any such disease "anything could be considered the cause."   App. 129.

**16.**  Dr. Simon testified that a known asthmatic exposed to dust could suffer asthma for as long as the exposure lasted and for several weeks following removal of that exposure.   In most cases Dr. Simon had seen, "in a week to 2 or 3, it should settle down, provided no other factors were present."   App. 117.

**17.**  Dr. Simon categorized Champion's initial asthmatic condition as "occupational" asthma, which "by definition . . . comes on when you are exposed to whatever it is with your work that aggravates the asthma and it is relieved once you stop that exposure . . . .   Most occupational asthmas relieve promptly once removed from that environment."   App. 118.   According to Dr. Simon, the state of the art is very difficult because there has been "some early testing with occupational materials but not to the degree that the more common allergic substances such as ragweed, pollen, house dust have been worked out."   App. 118–19.

Prednisone is a very important medication for asthma as well as for sarcoidosis, but because of side effects, it is a "court of last resort." App. 142. Its side effects are not only increasing appetite and weight, but also cosmetic, distorting the patient's face into a round shape and depositing humps of fat on the back. In addition, it may cause a peptic ulcer to bleed and cause adrenal gland insufficiency. *Id.*

By the time Dr. Katz examined Champion, his treating physicians had started prednisone again. The prednisone was then apparently prescribed solely for asthma, because there was no longer any evidence of sarcoidosis. App. 45–46. Dr. Katz also recorded that, after stopping prednisone temporarily in 1975, Champion's treating physicians started it again in 1976 for about six months "because his breathing became more difficult after the cessation of steroid [prednisone] therapy." App. 45.

Dr. Katz, like Dr. Simon, recognized that "[a]nxiety, tension [and] nervousness" can be intrinsic factors causing asthma attacks. App. 143. Unlike the other two, who did not discuss Champion's emotional state, however, Dr. Katz recorded that Champion "has felt rather markedly depressed and has seen a psychiatrist in the past and again is seeing one at the present time."[18] App. 46. According to Dr. Katz's testimony, Champion

... is very distressed over his obesity as the main reason for his distraught—He finds he is not acceptable as an obese man. He is not acceptable to members of his own sex, and more particularly, to members of the opposite sex. He has, therefore, a great deal of uneasiness and unhappiness because of his physical appearance.

.    .    .    .    .

He is nervous. He admits he's nervous. He didn't admit to overeating, but I bring this point up in relation to your asking about nervousness; because although he indicated to me he has no breakfast and

no lunch, and his total intake is one sandwich a day, that seemed incredible by his physical appearance.

And in perusing the hospital record and noting the nutritionist's report, his caloric intake was enormous, in that he documented that although he ate little breakfast and little lunch, he ate from then on, and ate heartily; 18 ounces of meat at night, snacking in between meals, having to eat before bedtime, and his caloric intake was phenomenal.

They put him on a 2000 caloric diet, which he did not adhere to, and kept gaining weight. As he said, he couldn't control his appetite.

.    .    .    .    .

The other thing he had, which was very striking, was—and if I were not in this position with him I would have been delighted to pursue it—his difficulty with sleeping and his tremendous snoring, which kept others in the environs awake; his difficulty with sleeping to the point that he fell asleep during the day. He would be talking with someone, and he would fall asleep.

He had a condition which, if we pursued it, would add up to what we call "sleep apnea," who, when they are asleep, will have the soft tissues of their neck descend over the opening to the windpipe, and when they breathe, this will flutter and give an intense snoring.

When I pursued this with him, he pointed out when he went to bed with a woman, he would wake up to find she was out of the room; she was gone. And when he pursued this further, it was that his snoring was so objectionable that she left.

App. 143–46.

Dr. Katz, like the other two medical witnesses, identified no cause for Champion's childhood asthma or the persistence of the condition initially aggravated by tunnel dust and fumes. Dr. Katz concluded that it

---

**18.** The psychiatrist was not identified by Dr. Katz, called by respondent, or sought by the ALJ.

was "coincidental" that Champion "developed this ongoing asthmatic problem at the same time he had a precipitating incident as a result of his work exposure." App. 163–64. However, Dr. Katz declined to respond to respondents' inquiry as to whether "it is on an emotional basis that the asthmatic problem continues," saying that it would be very "presumptuous " for him to answer. App. 145. He got along "beautifully" with Champion but did not have a "relationship of a psychiatrist to a patient." Id. On cross-examination, however, there was the following colloquy between Champion's counsel and Dr. Katz about the relationship between emotional factors and asthma generally:

Q. Isn't it axiomatic that asthmatics may have problems, increased problems, triggered by emotional upset?

A. No doubt about it.[19]

App. 161.

### III.

The ALJ found that Champion had been asthmatic since childhood and "outgrew" it sufficiently to engage actively in athletics, including contact sports, prior to his employment by respondent. The ALJ recognized that in February 1975, Champion "experienced a severe asthmatic attack" for which he sought emergency medical attention at G.W. University Hospital, and was admitted at D.C. General Hospital, where he was treated for bronchial asthma and provisionally diagnosed as having sarcoidosis and allergic asthma. App. 3.

The ALJ relied heavily upon Dr. Simon's testimony that since "the etiology of sarcoidosis is unknown, there was no medical or statistical basis for any inference that industrial exposure triggered that problem." App. 4. Based on this and other similar medical testimony, the ALJ found substantial evidence in the record to overcome the presumption that the sarcoidosis was work-related. App. 7.

The ALJ also noted Dr. Katz's initial opinion that as of April 1979, Champion was disabled because of respiratory difficulties due to bronchial asthma and that, in addition, his obesity was so severe that this by itself would keep him from functioning at a job in a normal fashion. However, the ALJ referred specifically to Dr. Katz's "firm opinion that such bronchospasm occurs during exposure to the irritant and does not continue beyond removal of the aggravating factor." App. 5.

According to the ALJ, the D.C. General Admission documents recorded Champion's weight as 240 and his psychological status as " 'well-adjusted.' " By August 1975, his weight was 268 and he was recorded as complaining of being "tense, nervous, unable to relax without cigarettes, tranquilizer librium." App. 3–4. A diagnosis in August 1975 included "mild iatrogenic Cushing's with element of compulsive eating" and "dependent personality." App. 4. However, the ALJ's findings took no note of the testimony of Drs. Simon and Katz that included emotional factors, along with pollen and the like, among the "irritants" that cause asthma attacks, the testimony from Dr. Katz about the psychiatric symptoms that he had elicited from Champion, Champion's own testimony about these symptoms or, most important, Dr. Katz's disclaimer of competence with respect to these symptoms.

In his discussion, the ALJ found it "clear from the evidence that the dust and fumes in the tunnel in which [Champion] was working aggravated his pre-existing asthmatic condition and precipitated his acute bronchial asthma attack for which he was hospitalized on February 26, 1975." App. 5. According to the ALJ, the hospital diagnosed and treated the bronchial asthma and the sarcoidosis (the cause of which is un-

---

19. Dr. Katz concluded, however, by rejecting as "theorization" and, therefore, unreasonable, a hypothetical inquiry as to whether Champion's "upset" about recurrence of the asthma and change in his physical features by virtue of his medication made him more susceptible to environmental influences that may not have previously caused him difficulties. App. 161–62. Dr. Katz had previously declined to address this kind of question because he was not a psychiatrist.

known) as two separate and unrelated conditions. He stated that "express statements in the hospital record [establish] that the prednisone was not prescribed for the asthma,[20] but was specifically administered for the sarcoidosis." App. 6. From this the ALJ reasoned that "it has not been established that there was a causal connection between the asthma and the corticosteroids that contributed to Claimant's obesity." *Id.*

Having thus detached the prednisone from the asthma, the ALJ found it "apparent" that Champion's subsequent disabling condition (presumably both asthma and obesity) might be glandular and/or psychogenic, "but," the ALJ reasoned, "there is no indication in the medical history that it was caused directly or indirectly by exposure to dust and fumes in the tunnel in 1974–1975." App. 6.

Overall, the ALJ found that there was substantial contrary evidence to overcome the statutory presumption of causal relationship, 33 U.S.C. § 920(a), and was persuaded "upon the entire record" that there was no causal relationship between the tunnel dust and Champion's disability after April, 1975. App. 7.

■ A majority of the Benefits Review Board felt obligated to affirm the ALJ's decision as "supported by substantial evidence in the record considered as a whole," not "irrational," and "in accordance with the law." App. 13, citing *O'Keeffe v. Smith, Hinchman & Grylls Assoc.*, 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965).[21] The Board found it "undisputed" that Champion was disabled due to asthma and obesity. The Board also noted that Champion has "emotional problems due to his asthma, obesity and his inability to make a living." App. 19. However, according to the Board, the ALJ had considered the Section 20(a) presumption and found it "rebutted by substantial evidence." The Board ruled, therefore, that the "evidence supports the administrative law judge's holding that claimant sustained only a five-week period of temporary total disability as a result of his exposure to dust and fumes in the tunnel environment." App. 23.

■ Judge Miller dissented "vigorously." App. 26. He charged his colleagues with ignoring the "well-settled principles that all doubts, including the factual, are to be resolved in favor of the claimant." *Id.* Judge Miller read the Section 20(a) presumption and the Act's "humanitarian nature" and "beneficent purposes" as requiring reversal of the ALJ, because the employer "did not establish that claimant's disabling conditions did not arise out of and in the course of his employment." App. 26–27. Judge Miller pointed to the ultimate fact that "claimant's asthma was asymptomatic prior to his work in the tunnel, that it became symptomatic as a result of his environment, and that it has continued to be symptomatic since the exposure occurred."[22] App. 27.

**20.** In fact, the hospital records are not entirely clear on this point. Respondent's own medical experts recognize prednisone as a proper medication for serious asthma (which in 1975 this certainly was, the dust irritant then having its full effect) and Dr. Katz would have prescribed it in 1979 when Champion was clear of both tunnel dust and sarcoidosis. Indeed, in 1979, Champion's treating physician was doing exactly that.

**21.** Although the Board could not condone the ALJ's "curt" refusal to allow post-hearing depositions of the two fellow workers Champion sought as witnesses and did not rule on this claimed violation of the ALJ's duty to "inquire fully into the matters at issue" (20 C.F.R. § 702.338), the Board treated as harmless any error in this respect. We are unable to characterize this error as harmless, considering the importance of the issue of emotional impact, which might well have been better developed through the testimony of Champion's co-workers, who had the opportunity to view directly his reaction to the work environment. We do not reach the issue of whether the ALJ's failure to file a timely decision resulted in any prejudice to the claimant, although we would note our hope that the case will be acted upon quickly on remand, so as to avoid further delays in the disbursement of benefits for which Champion has already had to wait much too long.

**22.** Judge Miller did not confront Champion's 1973 asthma attacks reported by D.C. General Hospital. But there is no evidence that Champion was on any medication or had any symptoms when he started work for respondent in

Nor was Judge Miller persuaded by the determination of his colleagues and the ALJ with respect to the disabling obesity. He felt that the employer failed to produce sufficient evidence pursuant to Section 20(a) to sever the connection between Champion's disabling obesity and his employment. Specifically, Judge Miller was persuaded that the employer failed to produce substantial evidence that prednisone was not prescribed as treatment for Champion's asthma.[23] App. 34.

## IV.

In his appeal here, Champion points to the testimony of Dr. Simon and others that if a patient with asthma experiences emotional upset, "he may continue to experience disability from the asthma." Brief of petitioner at 14. Champion's brief submits that in fact he "has experienced severe emotional difficulties due to his illness since 1975." *Id.* at 15. He challenges, among other things, the ALJ's failure to consider this potential causal connection between the disability resulting from his exposure to dust and fumes and his continuing total disability. In their brief, respondents also fail to address the issue of emotional trauma as a causal link, but they assert that the ALJ's decision disconnecting both the asthma and the obesity from Champion's exposure to the work environment was supported by substantial evidence.

We generally agree with Judge Miller's perception of the kind of substantial evidence required by Congress and the courts to overcome the statutory presumption in favor of a claimant like Champion, and we conclude that the Board erroneously approved the ALJ's finding that the employer had adduced such evidence here.

Our close examination of the record [24] persuades us that Champion's claim is supported by far more than enough evidence to remove it from the category of "mere fancy." *Wheatley v. Adler,* 407 F.2d at 313. The burden was therefore on the employer to produce substantial evidence [25] to rebut the statutory presumption "that the claim comes within the provisions" of the Act. 33 U.S.C. § 920(a). That evidence must be "specific and comprehensive enough to sever the potential connection between the disability and the work environment." *Parsons Corp. of California v. Director,* 619 F.2d 38 (9th Cir. 1980); *see In re District of Columbia Workmen's Compensation Act, supra.* In this sense, "the Act places upon the employer both the burden of production and the risk of nonpersuasion." *Stevenson v. Linens of the Week,* at 99. This burden is one to be strictly imposed, in light of the "humanitarian nature of the Act," *Wheatley v. Adler,* 407 F.2d at 312; and all doubts, including factual ones, are to be resolved in the claimant's favor. *Stevenson v. Linens of the Week,* at 98; *Hensley v. Washington Metropolitan*

1974, and his pre-1974 physique and athletic performance and his early job performance commendations showed he had no material disability from asthma, obesity, or any other cause before he went to work for the respondent. Of course, even if Champion's disability arose from work-related aggravation of a pre-existing condition, he would still be entitled to recover under the Act for that disability. *Wheatley v. Adler,* 407 F.2d 307 (D.C.Cir.1968), subject to any appropriate application of Section 8(f) of the Act, 33 U.S.C. § 908(f).

23. Judge Miller was also of the view that respondent failed to produce substantial evidence that the sarcoidosis was not caused by Champion's employment and was "unable to establish . . . that claimant's sarcoidosis could not have resulted from his work exposure to noxious fumes and dust" because, all agree, the cause

of sarcoidosis is unknown. App. 35. Accordingly, Judge Miller would have held that respondent failed to establish the lack of causal connection between claimant's work and his disabling obesity. *See* pp. 296–297, *infra.*

24. In addition to the Joint Appendix, the Court has reviewed the entire administrative record below, including Champion's hospital records.

25. Evidence will be considered substantial "if it is the kind of evidence a reasonable mind might accept as adequate to support a conclusion." *John W. McGrath Corp. v. Hughes,* 264 F.2d 314, 316 (2d Cir.), *cert. denied,* 360 U.S. 931, 79 S.Ct. 1451, 3 L.Ed.2d 1545 (1959); *see In re District of Columbia Workmen's Compensation Act,* 554 F.2d 1075 (D.C.Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976).

*Area Transit Authority, supra; J. V. Vozzolo, Inc. v. Britton, supra; see Voris v. Eikel, supra.* As we have stated before, the presumption "signals and reflects a strong legislative policy favoring awards in arguable cases." *In re District of Columbia Workmen's Compensation Act,* 554 F.2d at 1085, quoting *Wheatley v. Adler,* 407 F.2d at 312.[26]

Champion's claim of a causal connection between emotional trauma and his persisting asthma was plainly raised before the ALJ and in his brief here.[27] *Compare U. S. Industries/Federal Sheet Metal, Inc. v. Director,* 455 U.S. 608, 102 S.Ct. 1312, 71 L.Ed.2d 495 (1982). Employer's own medical expert, Dr. Katz, elicited from Champion a poignant history of the emotional trauma that he suffered because of his disability. Champion's own testimony described dramatically the immediate emotional effect on him of events from June 1974 to his disability and hospitalization in 1975: by the time he had been discharged from D.C. General in 1975, he was severely ill and he had lost his job, his children, his ability to work as a construction laborer, his ability to support himself, his athletic prowess, and many other elements of his earlier self-sufficiency and self-respect. There is no evidence that Champion's emotional trauma had its onset after, as distinguished from before, April 1975, and there is no evidence that it ever abated thereafter. Dr. Katz, who clearly recognized Champion's emotional symptoms, specifically disclaimed any qualification to address them. Finally, both he and Dr. Simon identified emotional trauma as one of the recognized causes of asthma. Yet neither respondent nor the ALJ

undertook to pursue the matter and dispose of this potential cause of Champion's disability as, we believe, the Act required.

Despite all this evidence of a causal connection between emotional trauma and Champion's obvious disability, coupled as it is here with the statutory presumption, the Board treated the emotional problem as "due to asthma, obesity and his inability to make a living." App. 19. The Board did not address emotional trauma as a possible *cause* of the continuing asthma.[28]

■ The ALJ ruled correctly that respondent is responsible for Champion's temporary total disability from asthma. The ALJ and the Board should have also found, on the facts and law here, that there was a presumption that emotional trauma caused by the original disability was a contributing cause of the persisting and disabling asthma and that employer failed to present substantial evidence to the contrary.

The issues raised by the contribution of obesity to claimant's disability are more difficult to resolve. There was considerable evidence that the prednisone was prescribed in 1975 for sarcoidosis alone and not for asthma. There was further evidence from the medical witnesses that sarcoidosis, while a disease of "unknown etiology," can be causally disconnected from Champion's exposure to the employer's work environment. We are troubled, nevertheless, by the ALJ's finding of "substantial evidence" that the obesity-producing prednisone was related only to sarcoidosis,[29] and that the sarcoidosis was totally unrelated to Champion's employment.[30] However, in light of the clear

---

26. Once the employer has met this initial burden, the presumption drops out of the case, and the ALJ is to base his decision on the record as a whole. *Del Vecchio v. Bowers,* 296 U.S. 280, 55 S.Ct. 916, 79 L.Ed. 1679 (1935). Since we find that the initial burden is not met, we do not need to decide who has the burden of persuasion at that later stage of the proceedings. *Compare In re District of Columbia Workmen's Compensation Act,* 554 F.2d at 1082 n.35 *with Parsons Corp. of California v. Director,* 619 F.2d at 41.

27. *See* p. 295, *supra.*

28. The fact that other factors may have contributed to Champion's disability is irrelevant, as long as the disability arose "even in part" from his employment. *Hensley v. Washington Metropolitan Area Transit Authority,* 655 F.2d at 268; *see O'Keeffe v. Smith, Hinchman & Grylls Assoc.,* 380 U.S. at 362, 85 S.Ct. at 1014.

29. *See* n. 20, *supra.*

30. We are also troubled by the ALJ's failure to consider notations in the hospital records that seem to suggest that Champion's emotional state might have been a contributing cause of his inability to control his weight.

lack of substantial evidence to rebut Champion's claim on the issue of his disabling asthma, another source of his admittedly total disability, we do not need to solve the puzzle about the relationship between sarcoidosis, prednisone, and obesity.

We have considered remanding the claim to the Board to enable the ALJ and the employer to reopen the evidence to develop proof that would disconnect the causes and consequences of the temporary disability from the emotional trauma or disconnect the emotional trauma from the persisting asthma. However, this has not been our practice in cases of this kind when the employer has failed to produce substantial evidence to meet his statutory burden,[31] and we are satisfied that it would be inconsistent with the humanitarian purpose of the Act and the trade-off that it effected to delay further the relief to which Champion is entitled on the only record that has heretofore been made.

Accordingly, we reverse the decision of the Benefits Review Board and remand for a calculation of the appropriate award in accordance with this opinion.[32]

---

31. *See, e.g., Hensley v. Washington Metropolitan Area Transit Authority, supra.*

32. We leave open the question of any potential applicability of section 8(f) of the Act, 33 U.S.C. § 908(f), to this case. Respondent has never sought to apply this section, either here or below; however, should respondent choose to raise it on remand, the ALJ should feel free to decide that issue on the merits. *See generally Director, Office of Workers' Compensation Programs v. Brandt Airflex Corp.,* 645 F.2d 1053 (D.C.Cir.1981).